**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN CUCULICH, SR., | ) | |
| | ) | Case No. 22 C 1302 |
| Plaintiff, | ) | |
| | ) | District Judge Charles P. Kocoras |
| v. | ) | Magistrate Judge Gabriel A. Fuentes |
| | ) | |
| JOHN GRIER and THE GRIER | ) | |
| LAW FIRM, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the magistrate judge on a referral including discovery supervision (D.E. 19), and before the Court is the motion of Defendants John Grier and the Grier Law Firm ("Defendants") to compel Plaintiff Steven Cuculich ("Plaintiff") to produce certain documents that Defendants requested under Federal Rule of Civil Procedure 34. The Court has considered the motion ("Motion"; D.E. 36), the response by Plaintiff ("Resp."; D.E. 41), and Plaintiff's reply in support of the Motion ("Reply"; D.E. 42). The Court decides the Motion within its substantial discretion to manage discovery under referrals from district courts, *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013), with the intent of promoting the just, speedy, and inexpensive determination of this matter, Fed. R. Civ. P. 1, and within the boundaries of permissible discovery into nonprivileged matters relevant to claims and defenses in the action and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

## BACKGROUND

In this legal malpractice action here on diversity, Plaintiff alleges that Defendants provided him with negligent legal advice in connection with his execution of a guaranty that now gives rise to possible liability for him in an action pending in the Circuit Court of Cook County. The parties

have summarized the case facts roughly as follows (Complaint (D.E. 1), passim): Plaintiff alleges that Plaintiff signed a guaranty in connection with a $47-million refinance loan in 2016 involving a Chicago property.  He says the guaranty was limited in that certain "carve outs" were negotiated such that Plaintiff's liability, as guarantor, would only be triggered upon the occurrence of certain enumerated bad acts committed by the borrower, an entity with which Plaintiff was affiliated. Such a guaranty is colloquially referred to in the industry as a "bad boy" guaranty. Defendant John Grier is said to have advised Plaintiff that should there be an event of default, Plaintiff would be potentially liable on the guaranty only if the borrowing entity did not tender, or refused to tender, a deed in lieu of foreclosure in the event of default on the loan. Grier denies having provided that advice, and Plaintiff says he would not have executed the guaranty if Grier had not provided that advice.  The lender, Deutsche Bank, through its loan servicer, sued Plaintiff on the guaranty in Illinois state court ("the Guaranty Action") after the loan went into default upon Roosevelt University's acquisition of the property and tenant Robert Morris University's abandonment of the lease and cessation of rent payment.

As Defendants see it: "Looking to blame someone else for his own mistakes and failed real estate investment, Plaintiff filed this lawsuit against Defendants" to shift onto them his potential $4 million in unpaid property tax and insurance. Motion at 2.  From Defendants' perspective, the $4 million in unpaid taxes and insurance would never have been incurred, and thus cannot be the responsibility of Defendants, if only Plaintiff's *subsequent* counsel had timely submitted the deed in lieu of foreclosure to head off Plaintiff's liability on the loan.  *Id.* at 6-7.  That subsequent counsel is an attorney with whom Plaintiff's current litigation attorney was formerly affiliated, Ariel Weissberg.  Defendants contend that had Weissberg in April 2020 not committed malpractice himself by not timely resolving the loan dispute by timely tendering the deed in lieu of foreclosure

2

or by "work[ing] out an assignment of the Property to the Lenders in lieu of a foreclosure action," Plaintiff would never have owed the $4 million. *Id.* The Court in this order is making absolutely no findings whatsoever on the veracity of Defendants' accusations against attorney Weissberg.

The discovery dispute now before the Court has several facets, the most substantial of which is whether otherwise privileged communications between Plaintiff and Weissberg (as Plaintiff's attorney in connection with the loan dispute) are now discoverable under the doctrine of "at issue" waiver of the attorney-client privilege.

## ANALYSIS

The Court's look at the doctrine of "at issue" waiver requires resort, in this matter before the Court on diversity jurisdiction, to Illinois law governing questions surrounding privilege. Fed. R. Civ. P. 501; *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 272 (N.D. Ill. 2004). To do so, the Court determines what the Illinois Supreme Court would do if it were presented with the issue. *Id.* at 276, citing *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir. 1997); *Kroll v. Cozen O'Connor ("Kroll I")*, No. 19 C 3919, 2020 WL 3077556, at *3 (N.D. Ill. June 10, 2020), *aff'd*, 2020 WL 11563948 (Dec. 10, 2020) ("*Kroll II*"). Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois appellate courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently. *Allen*, 128 F.3d at 466. Below, the Court examines the at-issue waiver question first and then addresses the remaining aspects of Defendants' Motion.

### I.    The Court Does Not Find that Illinois's At-Issue Waiver Doctrine Calls for Disclosure of the Privileged Communications Between Weissberg and Plaintiff.

The at-issue waiver doctrine in Illinois is not as broad as Defendants wish it to be. Although defense counsel skillfully has assembled a series of decisions under which the Court

might conceivably find that Plaintiff's privileged communications with Weissberg ought to be disclosed based on Weissberg's handling of the Guaranty Action, the Court declines to find at-issue waiver based on the facts and posture of this case.

> **A.** **Illinois Recognizes Only a Limited At-Issue Waiver Doctrine and Is Protective of the Attorney-Client Privilege.**

This Court determined in 2020 in *Kroll I* that the Illinois Supreme Court has yet to address squarely the question of whether implied or "at issue" waiver occurs with respect to a malpractice plaintiff's communications with attorneys who were retained or consulted after the allegedly tortious conduct. Neither party in this matter makes any different assertion. The Court and the parties draw upon *Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc.,* 189 Ill. 2d 579 (2000), as the Illinois Supreme Court's most definitive statement on the reach of at-issue waiver. But in that case, the Illinois Supreme Court limited the reach of at-issue privilege waiver of an adverse party's communications with lawyers other than those directly involved in the transaction or case out of which the malpractice allegations arose.

In *Fischel & Kahn*, the plaintiff law firm sued its former client art gallery for unpaid fees, prompting – as is frequently a law firm's reward for suing for fees – a legal malpractice counterclaim. The counterclaim accused the law firm of causing the gallery to incur damages by negligently advising it about how to limit its liability to consignment artists whose work was subsequently destroyed in a fire at the gallery. *Id.* at 581. The fire generated a separate piece of litigation in which a second law firm, Pope & John, represented the gallery and negotiated a settlement. In the litigation of the malpractice counterclaim, the first law firm, Fischel & Kahn, sought compelled discovery of Pope & John's privileged communications with the gallery under the theory that Fischel & Kahn needed the gallery's communications with Pope & John about the

fire litigation and its settlement in order to determine how much if any of the gallery's losses could be attributed to negligence by Fischel & Kahn. *Id.* at 585.

Reversing the Illinois Appellate Court, the Illinois Supreme Court in *Fischel & Kahn* acknowledged that the at-issue waiver doctrine at least exists in Illinois, stating that the gallery's counterclaim for legal malpractice "has placed Fischel & Kahn's advice at issue and has waived the attorney-client privilege with respect to communications between it and Fischel & Kahn." *Id.* The court declined, however, to hold that the at-issue waiver doctrine extended to the privileged communications between the gallery and its *subsequent* counsel, Pope & John, in the fire litigation. *Id.* The Illinois Supreme Court began with the premise that the purpose of the attorney-client privilege is "'to encourage and promote full and frank consultation between client and legal advisor by removing the fear of compelled disclosure of information.'" *Id.* at 584-85, quoting *Waste Mgt., Inc. v. Int'l Surplus Lines Ins. Co.,* 144 Ill. 2d 178, 190 (1991). The Illinois Supreme Court in *Fischel & Kahn* reasoned that the disputed nature of the gallery's damages (clearly put at issue by the gallery) did not mean that the gallery had waived its attorney-client privilege as to its communications with Pope & John simply because those communications "might touch on that question." *Id.* at 587. "If raising the issue of damages in a legal malpractice action automatically resulted in the waiver of the attorney-client privilege with respect to subsequently retained counsel, then the privilege would be unjustifiably curtailed." *Id.* Moreover, the Illinois Supreme Court in *Fischel & Kahn* also concluded that the privileged communications sought by the law firm were not "vital" to its defense of the action, in that "[e[vidence regarding the client's damages resulting from the law firm's alleged negligence would, in the present context, be available to either party." *Id.* at 588.

Defendants, as the parties seeking to break the privilege in this case to obtain communications between Plaintiff and attorney Weissberg, have not called the Court's attention to any more recent Illinois Supreme Court or Illinois Appellate Court decision on at-issue privilege waiver and attorneys other than those who represented the adverse party in the case or transaction, and the Court's own research found nothing to indicate that the Illinois courts, or the federal courts applying Illinois privilege law since *Fischel & Kahn*, have broadened at-issue waiver in any way that would aid Defendants' Motion. "[T]he Court agrees that the Illinois Supreme Court [in *Fischel & Kahn*] demonstrated a protective approach to the attorney-client privilege and work-product doctrine when one party claims a waiver of those privileges by placing into issue a factual matter regarding communications between a party and attorneys who became involved after the allegedly tortious conduct was over." *Kroll II*, cited with approval in *Symbria v. Callen*, No. 20 C 4084, 2023 WL 7490695, at *3 (N.D. Ill. Oct. 11, 2023).

      **B.**    **The Case Facts Here Do Not Support At-Issue Waiver Even Under More Expansive Judicial Approaches That Stretch the Doctrine to the Outer Boundaries of What Illinois Law Has Acknowledged.**

The Motion's attempt to peer into the privileged communications between Plaintiff and attorney Weissberg about the Guaranty Action hinges in large part on whether the Court finds that the tortious conduct Plaintiff alleges was "over" by the time of the Guaranty Action, or whether it somehow continued into the pendency of that action or should be deemed to have done so, based on how the outcome of the Guaranty Action might have been affected by Defendants' alleged malpractice. The Court sees Defendants' argument as too much of a stretch of the limited form of the at-issue waiver doctrine so far promulgated by the Illinois Supreme Court.

Defendants have pointed to several potentially illustrative decisions in which waiver was found, but the facts of this case counsel against following those decisions and hewing to a broader

view of attorney-client privilege protection and a narrower view of at-issue waiver. As Defendants note, *Fischel & Kahn* cited a Washington case, *Pappas v. Holloway*, 787 P.2d 30 (Wash. 1990), seemingly with approval, although *Fischel & Kahn* reached a different outcome in declining to find at-issue waiver. In *Pappas*, the party claiming malpractice had been sued for selling cattle diseased with a condition called brucellosis. In the brucellosis lawsuit, that party was represented by three attorneys at different points in time, and after the party counterclaimed (alleging malpractice) against the second of those attorneys, that attorney filed third-party complaints against the other two attorneys. *Id.* at 33. The Washington Supreme Court extended the at-issue waiver doctrine to the claimant's communications with those two other attorneys, based on the second attorney's contention that the other two attorneys' malpractice was relevant to his defenses against the counterclaim, and the court agreed. *Id.* at 35. Defendants focus on *Fischel & Kahn*'s characterization of the *Pappas* holding as calling for at-issue waiver as to "all attorneys involved in the underlying litigation" when a client sues a former attorney for malpractice. *See* Motion at 6, citing *Fischel & Kahn*, 189 Ill. 2d at 588. Defendants then analogize to *Pappas* by contending that Weissberg's participation in the Guaranty Action is akin to the kind of ongoing participation of subsequent counsel in cases like *Pappas*, in which the party claiming malpractice waived the privilege as to the attorney he accused of malpractice as well as that attorney's predecessor and successor counsel in the litigation in which the malpractice was said to have arisen. *See Pappas*, 787 P.2d at 33-35.

Defendants' reliance on *Pappas* gets the case's language right but misses the import of the case's facts and their differences from the facts in the instant case, which, factually, is much closer to *Fischel & Kahn*. *Pappas* involved a clearer connection between the malpractice of the "other" attorneys and the attorney whose supposed malpractice was placed squarely at issue by the

malpractice claim. All three attorneys in *Pappas* represented the claimant in the very same action, unlike in this case, in which the malpractice is said to have occurred at the business advice stage of the attorney-client relationship, and in which Defendants say the conduct of the "other" attorney – Weissberg – bears upon the damages element of Plaintiff's professional negligence claim. Defendants argue that even if Weissberg's representation came later in time, it necessarily must be considered part of an ongoing series of events that have been placed at issue by Plaintiff for suing Grier and the Grier firm in the first place. But the purported connection between Weissberg's work and the damages element make this case more like *Fischel & Kahn*, in which the Illinois Supreme Court reached the opposite result than the Washington court in *Pappas* on the at-issue waiver question. Thus the Court is not persuaded by Defendants' argument that *Fischel & Kahn*'s supposed citation of *Pappas* with approval for the proposition that a subsequent attorney's mere "involvement" in events subsequent to (and related to) the alleged malpractice is enough to support a claim that Plaintiff waived his attorney-client privilege as to Weissberg.

To be fair to Defendants, their argument goes somewhat farther than a claim that their advice surrounding the guaranty and the Guaranty Action itself are successive, related events. The heart of Defendants' argument is that the alleged malpractice was not truly "over" at the time of the pendency of the Guaranty Action, insofar as the unfolding events in that action, including Weissberg's not having tendered a deed in lieu of foreclosure to the plaintiff lender in that action for some two years, and his therefore having contributed to Plaintiff's "potential" liability in that action (a claim hotly disputed by Plaintiff), are an inextricable part of Plaintiff's malpractice claim. Arguably, then, if that is true, then Plaintiff might well have placed Weissberg's representation of him – in the Guaranty Action – at issue in the instant malpractice litigation. Defendants rely on a series of cases indicating that the cause-and-effect relationship between an initial act of malpractice

and events that follow it (and that bear upon damages) is sufficient to establish the malpractice claimant's waiver of the attorney-client privilege as to communications with the separate attorney involved in the subsequent events. But the Court has examined these cases and finds them either unpersuasive or distinguishable on the facts here, in consideration of *Fischel & Kahn*'s more limited view of at-issue waiver.

We start with *Lyon Fin. Servs., Inc. v. Vogler Law Firm, P.C.*, No. 10-cv-565-JPG-DGW, 2011 WL 3880948 (S.D. Ill. Sept. 2, 2011), a case upon which Defendants rely heavily. Motion at 7. In *Lyon*, the plaintiff Lyon sued the Vogler firm for malpractice in a lawsuit in which the Vogler firm had defended Lyon; the Vogler firm then filed a third-party complaint against two more sets of lawyers: those who replaced the Vogler firm in the same litigation, and those who represented Lyons on appeal in the same litigation. *Id.* at *1-2. The *Lyon* court's theory for at-issue waiver posited that the defendant Vogler law firm's malpractice continued after Vogler's representation because the Vogler malpractice "hamstrung" the subsequent attorneys in defending Lyon's position, placing the Lyon communications with those subsequent attorneys at issue. *Id.* at *3. But Defendants' continuing malpractice theory in the instant case does not posit that Weissberg was "hamstrung" by anything Defendants did – instead, Defendants allege that Weissberg committed a later, independent act of legal malpractice.

The part of *Lyon* perhaps most useful to Defendants is its language finding that by suing the Vogler firm, Lyon had waived its privilege as to the "subsequent" replacement and appellate counsel in the same case because Lyon's complaint sought damages not only for events occurring during the Vogler firm's representation but also during representation provided by subsequent counsel. According to Lyon, that subsequent counsel "may be liable for some loss," so that "the specific party, if any, that caused Lyon's trial loss remains *unresolved*." *Lyon*, 2011 WL 3880948,

at *3 (emphasis added).  Therefore, the *Lyon* court reasoned that Lyon had implicitly placed its communications with the subsequent replacement and appellate counsel at issue under the theory that "at least the effects" of that malpractice "must have continued" past the Vogler firm's representation of Lyon.  *Id.*

Defendants' theory linking *Lyon* to the instant case essentially is that Plaintiff's damages are "unresolved" and that Weissberg's supposed malpractice is somehow part of the "effects" of the alleged malpractice insofar as Weissberg perhaps could have avoided the tax and insurance liability but failed to do so.  In other words, in this way, Weissberg is said to have participated in the underlying "litigation."  Motion at 7.  The foreclosure events, and Weissberg's representation of Plaintiff over some two years of those events in the Guaranty Action, were not the events giving rise to the malpractice claim.  Defendants' allegations of negligence by Weissberg do not support at-issue waiver under a strict construction of *Fischel & Kahn*.  *Fischel & Kahn* limited at-issue waiver to bar its application to client communications with the second law firm about damages where those communications "might touch on" the damages claims that the non-movant had placed in issue by suing Fischel & Kahn.  189 Ill. 2d at 587.

The analysis here is the same as in *Fischel & Kahn*:  The communications between Plaintiff and Weissberg about the Guaranty Action might well "touch on" Plaintiff's damages claim based on Defendants' argument that Weissberg is to blame for those damages.  But Defendants have injected that issue into the case, and not Plaintiff.  In addition, the prosecution and defense of the Guaranty Action is not the set of transactions in which Plaintiff has alleged the malpractice occurred – the malpractice is said to have occurred at the advice stage at the time of execution of the guaranty.

Yet the Court does not have to conclude that the alleged malpractice by Defendants was "over" to decide that Plaintiff did not waive privilege as to his communications with Weissberg about the Guaranty Action. And this is because even if the series of events integral to Plaintiff's malpractice claim included the "effects" of the supposedly bad guaranty advice, as manifested in the prosecution and defense of the Guaranty Action, this Court still would decline to follow *Lyon* to find that at-issue waiver applies to the Weissberg communications. The thread that connects the bad guaranty advice with the later goings-on in the Guaranty Action is, after all, damages, an issue Defendants see as not resolved even at the time of filing of the Motion. (Defendants say that the Guaranty Action was set for trial on March 4, 2024.) In short, we are squarely in the territory of *Fischel & Kahn*. The Court accepts that events in the Guaranty Action might "touch upon" Plaintiff's damages now at issue in this case, but under *Fischel & Kahn*, that is not enough to support application of the at-issue waiver to the Weissberg communications. The Court sees nothing in the Illinois case law to suggest that the Illinois Supreme Court would limit *Fischel & Kahn* in this way, or, perhaps more accurately, that the Illinois high court would extend *Fischel & Kahn*'s limited recognition of the doctrine to cover the Weissberg communications under the facts here.

*Lyon* is part of a line of federal cases that Defendants view as supporting their expansive view of at-issue waiver under Illinois law, but insofar as this Court does not follow *Lyon*, nor does the Court follow those other cases, which are distinguishable for another important reason: the degree to which the Weissberg communications could be considered "vital" to the defense of the instant malpractice case. The "vital" nature of the sought-after privileged communications, or the absence thereof, was a significant part of the analysis in *Fischel & Kahn*. 189 Ill. 2d at 589. "Nondisclosure of van Straaten's communications with Pope & John about the course and conduct

of the Mesirow litigation will not prevent Fischel & Kahn from challenging van Straaten's evidence on the issue of damages." *Id.* *Lyon* saw the sought-after communications in that case as vital to the defense of the malpractice claims. 2011 WL 3880948, at \*4. The *Lyon* line of cases is discussed in *Webster Bank, N.A. v. Pierce & Assocs., P.C.*, No. 16 C 2522, 2018 WL 704693, at \*7-8 (N.D. Ill. Feb. 5, 2018), in which the district court on review for clear error affirmed a magistrate judge's findings applying at-issue waiver and at least implied that the district court saw the sought-after communications as vital to the defense. Similarly, the court in *London v. Johnson & Bell, Ltd.*, No. 11 cv 7389, 2012 WL 4892852, at \*2 (N.D. Ill. Oct. 10, 2012), another case in which the link between substitute attorneys and the defense of the malpractice damages claims was deemed to be enough to waive the privilege, saw the sought-after communications as vital.

Even if we were to accept the premise of cases like *Lyon*, *Webster*, and *London* that a causal relationship between the alleged malpractice and subsequent events bearing on damages triggers at-issue waiver, and even if we were to accept the construct of *Webster* that at-issue waiver occurs unless the subsequent or "other" counsel's representation of the malpractice plaintiff "neatly fit[s] under the holding of *Fischel & Kahn*," this case is distinguishable because Defendants have not shown that the Weissberg communications are vital to their defense, and the facts of record suggest otherwise.[1] Defendants focus on Weissberg's alleged failure to tender the deed in lieu of

---

[1] Because we distinguish *Lyon*, *Webster* and *London* on their facts, the Court does not reach whether the Illinois Supreme Court ultimately would agree with extending at-issue waiver based on a theory of cause and effect on damages. The Court is not sure that the Illinois Supreme Court would so hold. The attorney-client privilege in Illinois, and generally, may warrant considerably greater respect. "To allow Fischel & Kahn to invade the attorney-client privilege with respect to subsequently retained counsel in this case simply by filing the affirmative defenses it did would render the privilege illusory with respect to the communications between van Straaten and Pope & John." *Fischel & Kahn*, 189 Ill. 2d at 586. *See also* David M. Greenwald, Michele L. Slachetka & Caroline L. Meneau, *Testimonial Privileges* § 1:87 at 368 n.10 (Thomson Reuters 2023 ed.) (setting off *Fischel & Kahn*, with "but see" signal, from other decisions in which at-issue waiver was extended to attorney-client communications with lawyers other than those sued for malpractice, and describing *Fischel & Kahn* as "no waiver as to subsequent litigation counsel where malpractice alleged against prior transaction counsel").

foreclosure; Plaintiff retorts that evidence adduced in discovery in this case has established that the lender would not accept the deed in any event, Resp. at 7, and that Weissberg in the Guaranty Action took other appropriate steps to stave off Plaintiff's liability under the guaranty for the unpaid taxes and insurance. *See id.* at 5 ("Weissberg admitted all the allegations in the Foreclosure Complaint and affirmatively requested judgment be entered in favor of the lender. Weisberg also affirmatively moved for summary judgment in favor of the Lender."). The issue Defendants say is potentially relevant to the damages claim is whether the foregoing action or inaction by Weissberg did or did not contribute to Plaintiff's liability in the Guaranty Action. The Court has no idea of whether such inaction did or did not contribute to that liability, and perhaps that question is being resolved at or near this moment, in the state court trial of the Guaranty Action. But either way, Defendants have advanced no basis for the Court to conclude that the *communications* between Plaintiff and Weissberg about the Guaranty Action over the course of two years are somehow "vital" to Defendants' defense that the $4 million in liability in that action was Weissberg's fault in all or in part. Only in their reply, Defendants refer to the Weissberg communications as "vital information relating to Weissberg's failed strategy in the underlying case," Reply at 2, but Defendants never say how those communications are vital. Conclusory statements not grounded in specific facts are not enough to support summary judgment in a civil case, *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017), and nor does the Court find Defendant's conclusory statements on the criticality of the Weissberg communications to be sufficient to show that they are so vital to the defense of this action that piercing the attorney-client privilege is necessary here. Weissberg's defense of the Guaranty Action, or his non-defense, as it were, will or will not provide Defendants with ammunition to shoot down Plaintiff's damages claims in the instant action. If there is a reason to believe that a foray into Plaintiff's privileged communications with Weissberg

about the Guaranty Action is so necessary as to be "vital" in the sense that the Illinois Supreme Court used that word in *Fischel & Kahn*, or in the sense that the *Lyon* line of cases considered that word, Defendants have not expressed one. *See Hakim v. Safariland, LLC*, 79 F.4th 861, 872 (7th Cir. 2023) ("[W]e have made clear that . . . perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

## II. The Remaining Four Issues Raised in the Motion State No Grounds for Relief.

Defendants direct the bulk of their Motion at the privilege waiver issue, *see* Motion at 3-9, but they also raise four other issues: (1) whether Plaintiff waived the attorney-client privilege as to communications with Weissberg (with whom current Plaintiff's counsel Christopher Langone was formerly affiliate) *and* Langone because a third person, attorney Joe Nicosia, was made privy to those conversations; (2) whether Plaintiff should be ordered to undertake additional efforts to retrieve certain emails that Defendants say are "missing" or "deleted" from Plaintiff's email account; (3) whether Plaintiff should be compelled to produce the full set of emails that he received from an electronic discovery consultant for relevance review in this case, based on apparent discrepancies between the consultant's "hit count" of documents with key search term hits and the number of documents Plaintiff produced after its review of that document set; and (4) whether Plaintiff should be ordered to "complete its investigation," within two weeks, into whether additional responsive documents exist and should be produced in response to Document Request Nos. 52-59, given that Plaintiff's counsel indicated to defense counsel that some additional responsive documents may exist. None of these arguments warrants compelled production of additional documents in this case.

First, as to Nicosia, Defendants admit that this person is or was an attorney at the relevant time, but Defendants claim that because he did not have an appearance on file, or because Plaintiff

has not offered other evidence (such as an engagement letter) to support Plaintiff's assertion that Nicosia was acting as an attorney, the communications that included Nicosia are discoverable in that the privilege associated with them was waived. Motion at 9-10. This argument misses the mark. The attorney need not be retained or paid a fee for the privilege to apply, *Testimonial Privileges* § 1:24 at 90, and Defendants have offered no authority for the like counterintuitive proposition that an attorney must have an appearance on file in order to qualify as someone with whom a litigant may have privileged communications. If attorneys needed to have appearances on file for their communications with clients to qualify as privileged, in-house counsel in most cases could never be involved in a privileged communication. If attorneys needed to have engagement letters or other documentary evidence available to prove that a communication was made in confidence to an attorney for the purpose of the rendering of legal services, criminal defense attorneys could never have privileged communications with clients whose families have summoned the attorney to meet with the clients in a police lockup or at an early-stage hearing before an engagement letter is prepared, or even to discuss with clients the confidential facts of a potential representation before clients have decided to retain them.[2] Defendants have inadequately supported this argument, and the Court accepts Plaintiff's counsel's representation, as an officer of the court, that because Nicosia is an attorney, communications that included him remain protected by the privilege. Resp. at 7-8. The Court cannot grant the extraordinary relief of breaking the privilege as to communications Plaintiff had not only with Weissberg, but with his current litigation counsel, Langone, on this record.

Second, Plaintiff acknowledges that certain emails did in fact disappear from his Yahoo email account during the process of their review or handling by an ESI consultant named "E-

---

[2] Plaintiff has included in the record a "Retainer Agreement" dated April 30, 2020, between Plaintiff and Nicosia. Resp., Exh. 1.

Hounds." Resp. at 9. Plaintiff is currently without an explanation for how this happened. *Id.* As concerning as this event is, *see generally DR Distributors, Inc. v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 923-28 (N.D. Ill. 2021), Plaintiff is asking that no further order be entered now on this aspect of the Motion while discovery proceeds from E-Hounds, and while the parties perhaps learn from that discovery whether or how the E-Hounds dog (or someone else) ate the homework, and whether the lost emails were (as Plaintiff indicates) largely duplicative of other discovery produced in the case. For now, the record presents insufficient facts or grounds to grant the Motion on this question, so that form of relief is denied.

Third, the Court addresses Defendants' effort to obtain compelled production of a "complete set" of emails that were from another email account, known as "the Rampante Account" and that Plaintiff's discovery consultant (E-Hounds) apparently delivered to Plaintiff on a hard drive. Defendants believe they should receive all the emails on the hard drive so that they can undertake their own review of it because Plaintiff must be withholding a large number of non-privileged responsive emails, based on a discrepancy in the "hit count" run by E-Hounds and the number of responsive emails Plaintiff actually produced. Motion at 13. Plaintiff's counsel represents that it undertook an exhaustive review of the emails from the Rampante Account and produced what was responsive and non-privileged. Resp. at 9-10. Defendants have offered nothing to support a disproportionate and costly second review based on Defendants' mistrust of Plaintiff based on discrepancies between hit counts and produced documents, as if hit counts yielded a reliable number of documents that upon attorney review are actually responsive. The hit count discrepancy amounts to an argument "full of sound and fury, [s]ignifying nothing." *See* William Shakespeare, *Macbeth*, Act V, Scene V, l. 27 (ca. 1623), reprinted in Mortimer Adler, *Great Books of the Western World*, Vol. 27 at 309 (Encyclopaedia Britannica 1952); Motion at 13-

14. The Court will not order Plaintiff to re-review the emails from the E-Hounds hard drive and will not order Plaintiff to turn over that hard drive so that Defendants can undertake their own uber-review. Defendants have advanced no basis for either measure.

Fourth, and finally, the Court will not order Plaintiff to "complete" an investigation into whether additional documents exist responsive to Document Request Nos. 52-59, as this issue is not ripe for resolution on a motion to compel, and Plaintiff is already under a duty to supplement his production seasonally to the extent he finds he has additional responsive documents that he has not produced. Plaintiff's counsel's apparent statement to defense counsel that more documents may exist is not enough to trigger a judicial order commanding Plaintiff to do what he already is required to do, particularly where Defendant cannot identify what is missing from the document production and cannot even confirm that anything is missing. If Plaintiff has more documents to produce, than Plaintiff must produce them, and as soon as reasonably practicable. But the Court will not grant the Motion's request relief that Plaintiff embark on an investigation and complete it within a set time frame. The parties are able to meet and confer further per Local Rule 37.2 to determine further whether any basis for additional motion practice exists. No additional relief in this regard will be ordered now.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Compel (D.E. 36) is denied.

**SO ORDERED.**

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: March 18, 2024**