UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN CUCULICH, SR., | ) |
| Plaintiff, | ) ) ) |
| v. | ) 22 C 1302 |
| JOHN GRIER and THE GRIER LAW FIRM, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

In this legal malpractice action, Plaintiff Steven Cuculich, Sr. alleges that Defendants John Grier and The Grier Law Firm provided him with negligent legal advice in connection with his execution of a guaranty. Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, both motions are denied.

## BACKGROUND[1]

First, the major players. Cuculich is a wealthy and sophisticated commercial real estate investor with a net worth of over $32 million and over 40 years of experience investing in commercial real estate. Grier is an experienced and sophisticated commercial real estate attorney. He worked at Winston & Strawn LLP, a preeminent

---

[1] The following facts are drawn from the record and the parties' summary judgment briefing and are undisputed unless otherwise noted.

global law firm, for fourteen years and then at Neal, Gerber & Eisenberg LLP for two years before starting his own firm, The Grier Law Firm, located in Western Springs, Illinois. Joseph Nicosia, III is Cuculich's son-in-law. From approximately September 2007 to September 2016, Nicosia was as an attorney at Winston & Strawn LLP. He concentrated his practice on private equity, real estate, mergers and acquisitions, and securities.

In June 2015, Nicosia formed Rampante Realty Partners, LLC ("Rampante") for the purpose of purchasing 401 South State Street in Chicago, Illinois ("Property"). The other members of Rampante were Cuculich, Cuculich's son, and Nicosia's mother. Nicosia was the point of contact for Rampante on matters related to the purchase of the Property.

In September 2015, Nicosia contacted Grier and asked him to represent Rampante in purchasing the Property. Grier agreed to do so. Paragraph 1 of the Engagement Letter states:

> 1. <u>Client</u>. Our client in this engagement is Rampante Realty Partners, LLC ("you"). We will not be representing any owners, members, directors, officers or employees or other affiliates unless we are specifically engaged to do so. Accordingly, absent a specific, separate engagement to represent such other persons or entities, you agree that our representation of you does not create an attorney-client relationship between the firm and any of such other persons or entities.

Dkt. # 88-2, at 289. Nicosia, as Rampante's agent and point person, signed the engagement letter on September 21, 2015, and understood that Grier was representing

only Rampante. There are no other written agreements between Grier and Rampante or any member of Rampante.

On May 12, 2016, Grier received the loan documents. Under Article 13 of the loan agreement, the borrower had recourse liability for, among other things, failing to pay taxes and insurance on the Property in the event of a default. In order for Rampante to close the deal, the lender required a limited recourse guaranty executed by Cuculich. The lender required Cuculich, as guarantor, to guarantee the recourse obligations of the borrower under Article 13 of the loan agreement. Nicosia understood that the guaranty was required in order to close the transaction.

Grier testified that, during a conference call on May 17, 2016, Nicosia asked questions about what would happen if there was no cash flow on the Property and what to do in that circumstance to cut off the continuing liability for taxes, insurance, property expenses, and other recourse obligations. Grier further testified that he and Nicosia discussed deeds-in-lieu of foreclosure on this call, and he answered Nicosia's questions about "tendering versus doing" a deed in lieu. Nicosia disputes that any of these topics were discussed that day.

The record gets dicey after this point. The parties agree that phone calls occurred in early June between Nicosia and Grier, and between Nicosia and Cuculich, but sharply dispute the content of those communications.

In Grier's version of events, around June 1 or June 2, 2016, Nicosia called Grier "in a panic" and told him that Cuculich was not comfortable with the guaranty and was

3

not going to sign it. Nicosia purportedly told Grier that Cuculich had retained Florida counsel who was reviewing the guaranty.[2]

On June 6, 2016, Nicosia, acting as point person Rampante, called Grier and said he had a call the following day with Cuculich and Cuculich's counsel to discuss the guaranty. Nicosia wanted information about the guaranty for the purpose of negotiating with Cuculich and his counsel to sign the guaranty. Nicosia and Grier had an in-depth discussion about the nature of the guaranty.

On the morning of June 7, 2016, Grier called Nicosia and asked how the call with Cuculich and Cuculich's counsel had gone. Nicosia said it had not happened yet and asked, for the purpose of getting ready for the call, if Grier could send an email confirming what they talked about the night before. Grier emailed Nicosia as requested. The email stated, in relevant part, "As we discussed, for failing to pay taxes and insurance there's a carve out even if there's no cash flow. As we discussed, your option at that point to end liability would be to do a deed in lieu." Dkt. # 88-7, at 118.

In Cuculich's version of events, there was never any mention of Florida counsel, and Nicosia never called Grier "in a panic." Nicosia called Grier on June 6, 2016, and they had a "brief" discussion about a deed in lieu. Grier told Nicosia that in order to cut off Cuculich's liability, all he needed to do "was to do a deed in lieu." Dkt. # 88-5, at 72. Nicosia testified that Grier described that doing a deed in lieu is "essentially

---

[2] Nicosia denies ever mentioning Florida counsel, and Cuculich denies the involvement—or even the existence—of any Florida counsel.

hand[ing] the keys back to the property." Dkt. # 88-2, at 72. There was no discussion of "tendering" versus "doing" a deed in lieu, or that the bank had to actually accept the deed in lieu, or that Cuculich could be potentially liable for taxes and insurance even if he immediately surrendered the Property.

Nicosia testified that he asked Grier to put his advice in an email so he could communicate it to Cuculich clearly and directly, without the risk of misstating or miscommunicating the advice. Nicosia explicitly told Grier that the information he sought was for Cuculich's benefit. Grier did not tell Nicosia that he could not advise Cuculich, that he was not Cuculich's lawyer, or that Cuculich should seek independent counsel. Grier summarized the June 6th phone call in an email on June 7th. Upon receiving Grier's email, Nicosia called Cuculich. Nicosia initially testified that he "literally read the email word for word" to Cuculich. Dkt. # 88-2, at 90. Later, he testified that "I'm sure I didn't read every single word. I specifically read the parts that Steve was most concerned about." *Id.* at 98.

Nicosia testified that during that phone call, Cuculich asked, "that just means all we have to do is give the keys back?" Dkt. # 88-2, at 102. Nicosia answered by giving Cuculich "additional" information "on top of" the email, which was "discussed in some paraphrased version." Dkt. # 88-2, at 103. Nicosia testified that it was "very possible" that he might have used the words "tendering the deed in lieu." *Id.* at 104. Nicosia does not recall whether Grier ever used the term "tendering" in connection with a deed in lieu.

5

When asked what Nicosia told him during the June 7th phone call, Cuculich testified that he "absolutely [did] not" recall; however, he understood that giving up a deed in lieu "would make everything go away." Dkt. # 88-5, at 49. Cuculich had heard the term "deed in lieu" before in other real estate transactions.

All parties agree that, after the call between Cuculich and Nicosia, Cuculich agreed to sign the guaranty—which he did on June 10, 2016. Cuculich claims that he relied on Grier's advice in executing the guaranty, and would not have executed the guaranty but for Grier's advice that he could cut off his liability by doing a deed in lieu of foreclosure.[3]

The lenders required Illinois local counsel to deliver an opinion that the guaranty was duly executed and delivered. Grier testified that he asked Nicosia if Cuculich's Florida counsel could give the opinion. Nicosia said it was going to take a lot of time

---

[3] Cuculich supports this fact by citing his own declaration, which was signed the day he filed his motion for summary judgment. Dkt. # 91-24. Defendants urge the Court to disregard the declaration under the "sham affidavit" rule, which "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018)); *see also United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016) ("The rule is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised.") (internal quotation marks omitted). The rule must be applied with "great care" because "summary judgment is not a tool for deciding questions of credibility." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). Every correction of memory failure or variation in a witness's testimony does not require that an affidavit be excluded as sham. *See id.* at 571–72. Rather, "an affidavit can be excluded as a sham only where the witness has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Id.* at 572 (cleaned up). Where the change is plausible or the party offers a suitable explanation for the change, the changes in testimony go to the witness' credibility rather than admissibility. *Funds in the Amount of $271,080*, 816 F.3d at 907. In the Court's view, Cuculich's declaration implicates credibility, not admissibility, concerns.

and asked Grier if he could add it to his opinion. Grier acquiesced to his client's (Rampante's) request because it was a limited opinion, equivalent to notarizing a document. Again, Cuculich and Nicosia disclaim the existence of any Florida counsel.

On June 10, 2016, Grier sent the "opinion letters" to Citigroup Global Markets Realty Corp. and Morrison Street Capital in which he stated that Cuculich properly signed the guaranty and delivered it. The letter to Morrison Street Capital stated, in pertinent part: "We have acted as special Illinois counsel to Steven A. Cuculich, Sr., as guarantor (the 'Guarantor') in connection with a loan made the date hereof to 401 S. STATE STREET MEMBER, LLC . . . ." Dkt. # 91-9, at 2. The letter to Citigroup stated, in pertinent part: "[W]e have acted as counsel to Steven A. Cuculich, Sr., an individual (the 'Guarantor') in connection with the Loan. This opinion is being delivered to you at the request of the Borrower and the Guarantor as required under the Loan Agreement referred to below." Dkt. # 91-8, at 2. Grier did not provide Cuculich with copies of these letters.

In June 2016, Rampante, through its subsidiaries, purchased the Property for just over $68 million. Grier and Cuculich have never met in person. Grier has never sent Cuculich any correspondence, whether by email or letter. The only time Grier heard Cuculich's voice was after the deal closed on June 10, 2016, when Nicosia called Grier and said he was with his partners and wanted to convey their thanks for getting the deal done.

In April 2020, Rampant defaulted on the loan and failed to pay property taxes and insurance, triggering the guaranty's carve-out for "Guaranteed Obligations." On August 13, 2021, the lender issued a written demand to Cuculich under the guaranty for approximately $4 million plus an additional sum in related costs, fees, and expenses. The lender then filed a lawsuit against Cuculich in connection with the guaranty on September 24, 2021. On January 19, 2022, Cuculich "sought to do a 'deed in lieu' to resolve all claims against him." Dkt. # 96, ¶ 26. The lender did not accept the tender. On May 17, 2024, Cuculich and the lender executed a settlement agreement resolving the lender's claims against Cuculich. Cuculich agreed to pay $3.5 million.

On March 10, 2022, Cuculich filed this lawsuit against Defendants alleging professional negligence. Before the Court are the parties' cross-motions for summary judgment.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Cross-motions for summary judgment must be considered separately in the sense that each party bears their "respective burdens on cross-motions

for summary judgment." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008). The Court evaluates cross-motions one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party. *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is appropriate only when the evidence "as a whole" shows there is no genuine dispute as to any material fact—this includes evidence submitted with another party's cross-motion. *See Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012) ("Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute.").

## DISCUSSION

Defendants assert they are entitled to summary judgment for several reasons. First, they argue Cuculich has no admissible evidence of what advice he received from Grier (through Nicosia) during their June 7th phone conversation, because it is hearsay. Second, they contend Cuculich does not have evidence from an expert who can opine on the standard of care in Illinois. Third, the engagement letter expressly disclaimed any representation of Cuculich, and Grier never agreed to represent Cuculich regarding his decision to sign the guaranty. Lastly, Defendants assert Cuculich cannot prove

9

causation because he signed the guaranty based on information that he "had heard . . . before in real estate transactions" and not based on information he received from Nicosia.[4]

Cuculich, on the other hand, contends he is entitled to summary judgment because the undisputed facts and evidence show that Grier was Cuculich's attorney, that Grier breached the standard of care, and that breach caused him damages. Both motions rest on numerous factual disputes, rendering summary judgment for either side inappropriate.

"In order to prevail in a legal malpractice claim, a plaintiff must show: (1) the existence of an attorney-client relationship establishing a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause establishing that, 'but for' the attorney's negligence, the plaintiff would have prevailed in the underlying action; and (4) damages." *Sterling Radio Stations, Inc. v. Weinstein*, 328 Ill. App. 3d 58, 62–63 (2002) (citing *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 351 (2000)). If Cuculich fails to prove any one of these elements, he cannot prevail on his legal malpractice action. *Reddick v. Suits*, 2011 IL App (2d) 100480, ¶ 31.

To form an attorney-client relationship, both the attorney and the client must consent to its formation and "[c]onsent can be express or implied." *Meriturn Partners,*

---

[4] This one is quite a stretch. Recognizing a term and understanding it are two different things.

*LLC v. Banner & Witcoff Ltd.*, 2015 IL App (1st) 131883, ¶ 10. "A client cannot unilaterally create the relationship, and the putative client's belief that the attorney is representing him is only one consideration." *Id.* But, "[i]f an attorney knows that a person is relying on his performance of services and he performs for that person's benefit without limitation, an attorney-client relationship can be found." *Id.* "The client's reasonable belief rather than the attorney's words or actions ultimately controls whether an attorney-client relationship has been formed." *UFT Commer. Fin., LLC v. Fisher*, 991 F.3d 854, 858 (7th Cir. 2021)

"Whether an attorney-client relationship exists, and thus whether the attorney owes a duty to a particular person, is a question of law. However, findings of fact often must be made concerning the formation of the attorney-client relationship to, for example, resolve disputes concerning communications, acts undertaken, or the parties' respective understandings." *Meriturn Partners, LLC*, 2015 IL App (1st) 131883, ¶ 10 (citations omitted); *see also Kaemmerer v. Wagner*, 2011 WL 10500924, at *6 (Ill. App. Ct. 2011) ("However, whether the parties stand in the relationship of attorney/client to each other, giving rise to the duty, remains one of fact for the jury, unless, of course, the facts are undisputed and only one conclusion can be drawn from those facts."). In this case, the many disputed facts necessitate resolution by a trier of fact.

This case boils down to "he said, he said, he said." The content of the conversations between Nicosia and Grier is hotly disputed, as is the admissibility of the

11

content of the conversations between Nicosia and Cuculich. Grier says Cuculich had Florida counsel, a claim Nicosia and Cuculich flatly deny. The parties cannot agree on whether Grier and/or Nicosia used the term "offer" or "tender" or just "do" a deed in lieu. Grier used "do" in his email, and Cuculich and Nicosia waffle back and forth between "offer" and "tender" in their depositions and Cuculich's summary judgment briefing.[5] Grier emphasizes that his conversations with Nicosia about the guaranty were conversations with his client's "point person," whereas Nicosia asserts that he explicitly told Grier he was seeking legal advice for Cuculich. Grier says he was retained by Rampante specifically for the purchase of the Property, and maintains that any work he did in connection with the guaranty was solely for the benefit of his client—it was his duty to answer Rampante's questions about the scope of the guaranty. And Grier's statements in the opinion letters that he acted as counsel to Cuculich are not as damning as Cuculich would have the Court believe, because "representation on particular matters does not create an attorney-client relationship with respect to other matters." *Scanlan v. Eisenberg*, 913 F. Supp. 2d 591, 595 (N.D. Ill. 2012).

Nicosia first said he read Cuculich Grier's email verbatim, but there's later mention of paraphrasing and adding information "on top of" what was in the email. No one knows what that information was. Cuculich testified at his deposition that he cannot

---

[5] Defendants assert the distinction between doing a deed in lieu and offering/tendering a deed in lieu is critical. Offering/tendering a deed in lieu is only one part of "doing" a deed in lieu. The lender then has to actually accept the tender. Plaintiff says this is a distinction without a difference under the facts of this case because "Plaintiff could not '*do a deed in lieu*' unilaterally." Dkt. # 102, at 7.

recall what exactly Nicosia relayed to him about what Grier said; he only knows that he came out of that conversation that "giving the keys back" would absolve him of liability. In his later declaration, however, Cuculich attests the advice he received was that he "could 'end' any such liability by 'doing a deed in lieu' of foreclosure if the property underperformed," and that he relied on that advice in deciding to sign the guaranty. Dkt. # 91-24, ¶¶ 5–6. These matters go to Cuculich's and Nicosia's credibility.

In short, there are genuine factual disputes concerning the existence of an attorney-client relationship between Cuculich and Grier. The evidence is conflicting, and the question of whom to believe and what weight to be given to all the evidence is properly a decision for the trier of fact.

Regarding the breach of duty element of Cuculich's claim, both sides agree that expert testimony is required. They disagree, however, about the standard of care to be applied in this case. Cuculich contends that New York law should be applied because New York law governs the loan agreement and guaranty, and thus the legal advice that should have been provided regarding the guaranty. Cuculich says, "[t]he interpretation of what would or would not release the guarantor is fundamentally a question of contract law under New York (not Illinois) law." Dkt. # 102, at 8. Defendants, on the other hand, argue that the standard of care under Illinois law should be applied because the Property is in Illinois and the Illinois Mortgage Foreclosure Law governs deeds in lieu of foreclosure on property in Illinois.

13

In the Court's view, very little benefit would be derived from wading into this quagmire now given too many factual disputes prevent the Court from concluding an attorney-client relationship has been established as a matter of law. The existence of an attorney-client relationship is the foundation upon which Cuculich's entire action is built. Without that relationship, Cuculich's claims crumble. At bottom, neither side has met their burden of proof at summary judgment. Both motions are denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [87] and Plaintiff's Cross-Motion for Summary Judgment [90] are denied. A telephonic status hearing is set for 10/28/2025 at 10:00 a.m.

It is so ordered.

                                                          Charles P. Kocoras
                                                          United States District Judge

Date: October 8, 2025